IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ALEC RAMIREZ (01),<br><br>Defendant. | Case No. 21-20058-01-DDC |

**MEMORANDUM AND ORDER**

Defendant Alec Ramirez has filed a Motion to Suppress (Doc. 26) asking the court to suppress evidence. The motion seeks to suppress a specific collection of evidence, *i.e.*, the contents of Mr. Ramirez's backpack discovered after a warrantless search of his apartment and statements Mr. Ramirez made later to police officers about the items found in his backpack. The government has filed two responses in opposition—one before the suppression hearing (Doc. 30) and one after (Doc. 33), making an additional argument against suppression. For reasons explained below, the court denies Mr. Ramirez's motion.

**I.   Background and controlling facts**

The court held an evidentiary hearing on September 20, 2022, and unless otherwise noted, makes the following factual findings from the evidence presented on that date:[1]

On February 27, 2020, Overland Park Police Officers Marriott, Perdue, Hardin and Picht arrived at Mr. Ramirez's apartment in response to a medical assist call. Dispatch had informed officers that Mr. Ramirez was hallucinating, had experienced difficulty breathing, and had

---

[1] At the hearing, body camera video footage from Officer Picht was admitted as Exhibit 1 and body camera video footage from Officer Perdue was admitted as Exhibit 2. Also, former Officer Perdue testified.

1

expressed suicidal thoughts. Mr. Ramirez lived at the apartment with his girlfriend at the time, Maggie Brown. His parents, Melvin and Tabitha Lane, also were present at the apartment when officers responded to the medical assist call.

The officers arrived at the apartment and secured the scene. Emergency medical responders arrived around the same time as officers but waited for the all-clear from officers to go inside. Once inside, Mr. Ramirez informed the medical responders that he had taken oxycodone. One medical responder asked if Mr. Ramirez had an oxycodone prescription and if he had any stored in the apartment. Ms. Brown responded that Mr. Ramirez did not have such a prescription and that she didn't know of any oxycodone inside the apartment. Medical responders then took Mr. Ramirez outside on a gurney to go to the hospital. After Mr. Ramirez left for the hospital, police officers stayed at his apartment to collect more information from his mother, Tabitha Lane, and his girlfriend, Ms. Brown. As Officer Perdue explained in his testimony, the officers' questions sought to discern whether Mr. Ramirez's family wanted to pursue involuntary commitment proceedings.

The following facts—collected after Mr. Ramirez had departed the apartment—are relevant to the Fourth Amendment question whether a *government* search took place. The two officers' body camera footage establishes the following sequence:

- Officer Perdue asked Ms. Brown, "Where does he get the oxycodone? Does he have a whole lot here? Does he have a prescription currently?" Ex. 1 (Officer Picht's body camera video at 26:43); Ex. 2 (Officer Perdue's video at 26:00).[2]

- Ms. Brown responded, "He should not be prescribed it no, he's had addiction with pills before . . . and I don't know how he would've gotten it . . . ." Ex. 1 at 26:46.

---

[2] Sometimes, body cameras of both Officer Perdue and Officer Picht captured the same conversations. Other times, just one camera capture the conversation.

2

- Officer Perdue said, "[Mr. Ramirez] said he took a 20 milligram one today. Any idea where they are? I know you know what they look like, so I just didn't know if you think he has anymore laying around." Ex. 1 at 27:10; Ex. 2 at 26:27.

- Ms. Brown began looking around the apartment and said, "He's not stupid enough to put them anywhere where I'd [find] 'em," as she started to look in the apartment's hall closet. Ex. 2 at 26:40.

- As she searched the hall closet (Ex. 1 at 27:20), Officer Perdue asked her if Mr. Ramirez "hides them in the vitamin bottles or anything like that" (Ex. 2 at 26:45).

- Ms. Brown dumped the contents of a vitamin bottle she had removed from the hall closet into her hand, in front of Officers Picht and Perdue. Ex. 1 at 27:38; Ex. 2 at 26:54. She didn't find anything in that bottle's contents that she brought to the officers' attention.

- Then, Ms. Brown left the closet and walked into a guest bedroom. Ex. 1 at 27:59.

- Officer Perdue then returned to the living room to speak with defendant's mother, Ms. Lane, about involuntary commitment proceedings. Ex. 1 at 28:00 (Officer Perdue left the frame of Officer Picht's body camera); Ex. 2 at 27:20–27:57 (Officer Perdue speaking with Ms. Lane).

- When Ms. Brown walked into the guest bedroom, she picked up a black backpack (Mr. Ramirez's backpack with his first name embroidered on it) from the floor and placed it on the bed. Ex. 1 at 28:01.

- Officer Picht stood in the bedroom doorway watching Ms. Brown examine the backpack. Ex. 1 at 28:15.

3

- Ms. Brown found a prescription bottle inside the backpack and handed it to Officer Picht. The name of the patient was scratched off the label of this bottle. Ex. 1 at 28:20.

- In response, Office Picht asked, "Where was that?" Ms. Brown responded, "It was in his bag." Ex. 1 at 28:19–20.

- Officer Picht examined this bottle while Ms. Brown returned to the backpack on the bed. She continued to unzip pockets in the backpack and look inside them. Ex. 1 at 28:20–24.

- Officer Picht then walked from where he was standing in the doorway over to the bed next to Ms. Brown and said, "And what pouch was it in?" Ex. 1 at 28:25–26. In the full context of the evidence, the court infers that Officer Picht was inquiring about the bottle that Ms. Brown had found in the backpack and handed to him.

- In response, Ms. Brown pointed to a small front pocket of the backpack and said, "Right here." Ex. 1 at 28:30. Then, Ms. Brown pulled a handful of items—purportedly vials of fentanyl, morphine, and syringes—and tossed them on the bed for Officer Picht to see, in plain sight. She said, "There it is." Ex. 1 at 28:32–35.

- At this point, Officer Picht said to his fellow officer, "Perdue, you wanna come here a sec," calling to Officer Perdue who was in another room when Officer Picht made this statement. Ex. 1 at 28:37; Ex. 2 at 27:58.

- Officer Perdue walked into the bedroom; Officer Picht showed him the prescription bottle with the defaced label and said, "This is a hydrocodone" (Ex. 1

4

at 28:47), and then Officer Perdue asked about the vials and syringes laid out on the bed. (Ex. 1 at 28:52).

- Ms. Brown picked the items up one by one and said, "That's fentanyl, that's morphine . . . there's an oxy." Ex. 1 at 29:00–29:09.

- Officer Perdue asked if Mr. Ramirez was a nurse, and Ms. Brown confirmed that he was. *Id.*

- Officer Perdue asked Ms. Brown where the bag came from. Ex. 1 at 29:15; Ex. 2 at 28:32.  In context, the court finds that Officer Perdue was asking about the backpack Ms. Brown had examined.  By then, the backpack was on the bed in plain sight.  Based on the circumstances of the question, the court infers that Officer Perdue was asking about the backpack's location before Ms. Brown put it on the bed.

- Ms. Brown replied that the backpack "was just sitting in here" and that "[Mr. Ramirez] takes it to work every day."  Ex. 1 at 29:17; Ex 2. at 28:34.  In the context of the evidence, the court finds that Ms. Brown was explaining that the backpack was in the guest bedroom where she had examined its contents, and that Mr. Ramirez took it with him to work.

- Officer Perdue asked Ms. Brown, "Why did you look in it?" and Ms. Brown replied, "[Mr. Ramirez] has it all the time, so I figure if he was getting it from somewhere I figured it's maybe work." Ex. 1 at 29:20; Ex. 2 at 28:37.  In context, the court finds, Ms. Brown was referring to the oxycodone he had consumed earlier that evening.

5

- Officer Perdue then said to Ms. Brown, "So, I had said to you, I had said, do you think he has anymore here, and you started looking, and that's why we found it? Ok." Ex. 1 at 30:12; Ex. 2 at 29:32. Neither video captures Ms. Brown's response to this question.
- Officer Perdue then asked Ms. Brown a few more questions about how much fentanyl one of the vials contained, where Mr. Ramirez worked, and hospital controls of narcotics. Ex. 2 at 29:45–30:58.

After officers finished talking to Ms. Brown and Ms. Lane, they collected the vials and syringes from Mr. Ramirez's backpack as evidence. Then, Officers Marriott and Perdue went to the hospital to question Mr. Ramirez about the contents of his backpack. Mr. Ramirez's motion asks to suppress all evidence acquired as a result of the warrantless search of his apartment. Specifically, he moves to suppress: (a) the contraband found in his backpack; and (b) his statements to officers about the contraband Ms. Brown had located inside his backpack. Mr. Ramirez theorizes that his girlfriend, Ms. Brown, acted as a government agent when she conducted the search of their apartment—including his backpack—and that she neither secured his consent nor had the authority to consent on his behalf to a search of his backpack. The court addresses these arguments, below.

II.   **Motion to suppress search**

The Fourth Amendment forbids unreasonable searches and seizures. *Bailey v. United States*, 568 U.S. 186, 192 (2013). Searches "'conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). If a

defendant challenges the reasonableness of a search or seizure, the government bears the burden to prove, by a preponderance of the evidence, the reasonableness of that search or seizure.  *See United States v. Matlock*, 415 U.S. 164, 177 (1974); *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001).  If the court determines the search or seizure violated the Constitution and the law enforcement activity was not objectively reasonable, the court, with few exceptions, must suppress the fruits and instrumentalities of the challenged search or seizure.  *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014).

It's undisputed.  The officers didn't secure a warrant to search Mr. Ramirez's apartment.  The government asserts three reasons why the court shouldn't exclude the evidence.  *First*, the government argues, the Fourth Amendment isn't implicated at all because Ms. Brown conducted the search.  The government contends that law enforcement did not direct, coerce, or dominate Ms. Brown and she instead acted on her own accord to aid the involuntary commitment process.  Thus, the government asserts, a private search located the contraband.  *Second*, the government argues that even if Ms. Brown's search amounted to a government search, it fell within an exception to the Fourth Amendment's warrant requirement because it was a consensual search.  *Last*, the government argues, even if the search violated the Fourth Amendment the court still should not exclude the evidence based on the inevitable discovery doctrine.

### A.  Private search

The Fourth Amendment protects against unreasonable searches and seizures by the government, but is "wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any government official."  *United States v. Leffall*, 82 F.3d 343, 347 (10th Cir. 1996) (internal citation and quotation marks omitted).  However, if the private

7

party conducts the search as an "instrument or agent" of the government, the search implicates the Fourth Amendment. *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971) (internal citations and quotation marks omitted); *United States v. Smythe*, 84 F.3d 1240, 1242–43 (10th Cir. 1996). A search by a private citizen can become a governmental search "if the government coerces, dominates or directs the actions of a private person" conducting the search. *Pleasant v. Lovell*, 876 F.2d 787, 796 (10th Cir. 1989) (citing *Coolidge*, 403 U.S. at 489).

Our Circuit uses a two-prong test to determine whether a private person acted as an instrument of the police when conducting a search. *Pleasant*, 876 F.2d at 797. This test asks: "1) whether the government knew of and acquiesced in the intrusive conduct, and 2) whether the party performing the search intended to assist law enforcement efforts or further [her] own ends." *Id.* (internal citations and quotation marks omitted). To satisfy the first prong, police officers must "'affirmatively encourage, initiate, or instigate the private action.'" *United States v. Benoit*, 713 F.3d 1, 9 (10th Cir. 2013) (quoting *Smythe*, 84 F.3d at 1243). "'[I]f a government agent is involved merely as a witness, the requisite government action implicating Fourth Amendment concerns is absent.'" *Id.* (quoting *Smythe*, 84 F.3d at 1243).

The first prong of this standard requires the court to decide whether the search conducted by Ms. Brown was a governmental search directed by Officer Perdue or Picht. Based on the testimony of Officer Perdue and the evidence captured by officers' body cameras, the court concludes that the officers did not conduct a search, nor did they direct a private search, for Fourth Amendment purposes. Here, officers did not coerce, dominate, or direct the actions of Ms. Brown. Instead, "'a private person voluntarily [turned] over property belonging to another'" and the officers' participation was "'minor.'" *Smythe*, 84 F.3d at 1243 (quoting *Pleasant*, 876 F.2d at 797).

In *Coolidge v. New Hampshire*, the Supreme Court held the defendant's wife had not acted as an "instrument or agent of the state" when she turned over her husband's guns to the police. *Coolidge*, 403 U.S. at 487–90 (internal quotation marks omitted). In that case, police officers, while investigating her husband about a theft from his employer, questioned Mrs. Coolidge "about any guns there might be in the house." *Id.* at 488. In response, Mrs. Coolidge produced her husband's guns for the officers. *Id.* at 489. The Court held that when she, "of her own accord produced the guns . . . it was not incumbent on the police to stop her or avert their eyes." *Id.* The Court reasoned that in a situation where, as here, police ask questions, "there no doubt always exists forces pushing the spouse to cooperate with the police," but even so, "there is nothing constitutionally suspect about the existence, without more, of these incentives to full disclosure or active cooperation with the police." *Id.* at 487–88.

Here, Officer Perdue asked Ms. Brown one question—if Mr. Ramirez had any oxycodone in the apartment—and then Ms. Brown started looking around her apartment. The officers didn't instruct Ms. Brown to search the apartment or even ask her to do so. Once she started searching, the officers didn't tell Ms. Brown what to do or where to do it. Officer Perdue did ask if Mr. Ramirez hid his drugs in vitamin bottles while Ms. Brown already was looking through the medicine cabinet. And while one might interpret this question to instigate a search, that inference wouldn't help Mr. Ramirez. Ms. Brown didn't find any contraband while she looked through the medicine cabinet. Instead, she found the contraband after she left the hall closet where the couple stored their vitamin bottles. On her own, Ms. Brown moved to the guest room and started looking in an entirely new location. No evidence suggests that officers instigated Ms. Brown to go to the guest room and start searching there.

As for her search of the guest bedroom and backpack, Officer Perdue didn't direct Ms. Brown at all. In fact, by the time Ms. Brown found the backpack, Officer Perdue wasn't even watching her search. Officer Perdue had returned to the living room to ask Mr. Ramirez's mother more questions about involuntary commitment proceedings when Ms. Brown discovered the drugs and started showing them to Officer Picht. Likewise, Officer Picht didn't direct Ms. Brown to do anything. Officer Picht remained standing in the doorway while Ms. Brown opened the backpack, located the bottle of hydrocodone with a partially scratched off label in the backpack, and continued searching on her own. He didn't enter the room or approach her until she started pulling drug vials and syringes out of the backpack and placing them in plain sight. Officer Picht didn't "assist or encourage" Ms. Brown as she opened the backpack and removed the syringes and vials from it. *See Benoit*, 713 F.3d at 10 (holding that police officer did not direct private search of suspect's computer where suspect's girlfriend had discovered child pornography on his computer, called police, and played the video file for officer). Ms. Brown "retained full control over" Mr. Ramirez's backpack, "while [Office Picht] passively viewed [the contents of the backpack] shown to him." *Id*. The two officers here acted "with perfect courtesy" and without "the slightest implication of an attempt on their part to coerce or dominate" Ms. Brown. *See Coolidge*, 403 U.S. at 489. The court finds that Officers Perdue and Picht served as witnesses, not instigators, and thus, defendant fails to satisfy the first prong of the test.

As for the standard's second prong, the record does not contain any evidence that Ms. Brown intended her search "to assist law enforcement efforts." *See Pleasant*, 876 F.2d at 797 (internal citations and quotation marks omitted). In *Smythe*, the Tenth Circuit found no governmental search when a bus station manager opened a suspicious package in front of a

police officer because the manager "had a legitimate, independent motivation to search the package . . . his independently formed belief that something was dangerous about the package[.]" *Smythe*, at 1243 (internal citations and quotation marks omitted).  Here, Officer Perdue testified that he asked Ms. Brown about oxycodone in the apartment trying to discern how much Mr. Ramirez had ingested that night.  No evidence suggests any law officer instructed Ms. Brown to search the apartment or Mr. Ramirez's belongings.  Instead, they asked her open-ended questions such as:  (1) "Where does he get the oxycodone?"  (2) "Does he have a whole lot here?"  (3) "Does he have a prescription currently?"  (4) "Any idea where they are?"  Ex. 1 at 26:43–27:10; Ex. 2 at 26:00–27.  At no point did officers tell her that they were searching the apartment for evidence of a crime.  Ms. Brown responded to officers' questions, she told officers that Mr. Ramirez needed help and should be committed, and, on her own accord, searched through the apartment for his drugs.  Altogether, the totality of the evidence shows that Ms. Brown acted to assist officers in the involuntary commitment process, a "legitimate, independent motivation," and not to assist law enforcement efforts.  *See Smythe*, at 1243 (internal citations and quotation marks omitted).  The court finds that Ms. Brown acted on her "independently formed belief" about potentially dangerous contents in Mr. Ramirez's backpack.  *See id.*  In sum, defendant also fails to satisfy the second prong of the test.

The court thus finds that the officers acted as witnesses to a private search.  They did not search Mr. Ramirez's apartment or backpack on February 27, 2020.  Next, the court addresses the government's second argument.  It contends that even if the search had implicated Mr. Ramirez's Fourth Amendment rights, the court still should not suppress its fruits because it qualifies for an exception to the warrant requirement.  As explained below, the court agrees.

### B. Consensual third-party search

Consensual searches are a well-established exception to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Kimoana*, 383 F.3d 1215, 1221 (10th Cir. 2004). Law enforcement officers may acquire consent from the individual whose property is searched or, in certain instances, from a third party who possesses either actual authority or apparent authority to consent to the search. *See Matlock*, 415 U.S. at 169–72 (discussing actual authority); *Illinois v. Rodriguez*, 497 U.S. 177, 186–89 (1990) (discussing apparent authority); *Kimoana*, 383 F.3d at 1220–1223 (applying both doctrines). "A third party has actual authority to consent to a search if that third party has either 1) mutual use of the property by virtue of joint access or 2) control for most purposes." *United States v. Andrus*, 483 F.3d 711, 716 (10th Cir. 2007) (internal citation and quotation marks omitted). "[A]pparent authority exists when the officer reasonably believes that the consenter has actual authority to consent[.]" *United States v. Bass*, 661 F.3d 1299, 1304–05 (10th Cir. 2011) (citing *Rodriguez*, 497 U.S. at 186, 188). To assess apparent authority, the court first must analyze actual authority. *See id.* at 1305. The government bears the burden to prove that the consenting party had such authority. *See United States v. McAlpine*, 919 F.2d 1461, 1463 (10th Cir. 1990) (actual authority); *Kimoana*, 383 F.3d at 1222 (apparent authority).

Here, the evidence establishes that Ms. Brown consented to the search of the apartment that she shared with Mr. Ramirez when she invited officers into it and searched it in their presence. Specifically, Ms. Brown searched through Mr. Ramirez's backpack and handed Officer Picht a hydrocodone bottle with a defaced label. Then, she pulled more contraband and related paraphernalia out of the same backpack and showed it to the officers as well. In short, by conducting the search and showing officers what she found, Ms. Brown consented to the search.

12

The issue remains whether Ms. Brown had authority to consent to the search of the apartment she shared with Mr. Ramirez and, more narrowly, his backpack in the apartment. For reasons explained below, the court finds she possessed such authority, and thus the search fell within the consensual search exception to the Fourth Amendment's warrant requirement.[3]

        **i.    Third-party authority to consent to a search**

Ms. Brown had actual authority to consent to the search if she possessed "either 1) mutual use of the property by virtue of joint access or 2) control for most purposes." *Andrus*, 483 F.3d at 716 (internal citations and quotation marks omitted). She had apparent authority if an "officer reasonably believe[d]" that she had "actual authority to consent[.]" *Bass*, 661 F.3d at 1304–05 (10th Cir. 2011) (citing *Rodriguez*, 497 U.S. at 186, 188). Here, Ms. Brown possessed actual authority to consent to the apartment's search because she lived there with Mr. Ramirez, satisfying both the "mutual use of the property by virtue of joint access" prong and the control prong as well. The evidence establishes that Ms. Brown lived in the apartment with Mr. Ramirez and properly could provide access to it. It's a closer call, however, whether Ms. Brown possessed actual or apparent authority to consent to a search of Mr. Ramirez's backpack. In part

---

[3]    The parties' papers don't directly address the connection between the first issue presented by defendant's motion—was Ms. Brown's search a private search or a governmental search—and the consent issue. Perhaps they passed on the question because the fit between the two is a bit unusual. Here's how the court sees it.

If Ms. Brown's search of the guest room was a private search—and the court concludes it was—then Ms. Brown's authority to consent isn't an issue at all. As a non-governmental searcher, Ms. Brown may look wherever she likes. *See Leffall*, 82 F.3d at 347 (Fourth Amendment "wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as agent of the Government"). Her private search yielded contraband that she placed in plain sight of Officer Picht and in a place the officer legally could occupy.

But if Ms. Brown's search of the apartment and defendant's backpack qualifies as one conducted by the government, then the court must decide the consent question. The court thus addresses the consent question in the event a reviewing court disagrees with the court's holding on the first issue.

ii, below, the court discusses the scope of Ms. Brown's authority to give consent to a search of that bag.

### ii. The scope of Ms. Brown's authority to consent to a search included Mr. Ramirez's backpack.

Mr. Ramirez argues that Ms. Brown lacked authority to consent to a search of his personal backpack. Even if Ms. Brown had common authority over the residence, he argues, that "does not necessarily imply common authority over all locations or objects within the residence." *Bass*, 661 F.3d at 1305. To assess whether a container such as a backpack was within the scope of another person's authority to consent, the court must decide "whether the defendant's reasonable expectation of privacy was infringed by the third party's consent to the search[.]" *United States v. Cos.*, 498 F.3d 1115, 1126 (10th Cir. 2007); *see Georgia v. Randolph,* 547 U.S. 103, 112 (2006) ("[W]hen it comes to searching through bureau drawers, there will be instances in which even a person clearly belonging on premises as an occupant may lack any perceived authority to consent[.]"). "But a court will not 'engage in . . . metaphysical subtleties' in determining the boundaries of common authority." *Bass*, 661 F.3d at 1305 (quoting *Frazier v. Cupp*, 394 U.S. 731, 740 (1969)).

In *Bass*, the Tenth Circuit rejected defendant's argument that even if his girlfriend had common authority over the trailer they shared, she lacked authority to consent to a search of a bag located inside that trailer. *Id.* The Circuit affirmed the district court's finding that the defendant's girlfriend had apparent authority to consent to a search of his bag because the "zipper bag lying on the living room floor next to the couch, [was] hardly an object shouting 'Do Not Enter'[,]" and "[i]n light of the relationship between defendant and [his girlfriend], the officers could reasonably believe that he had 'assumed the risk,' that she might look in the bag for missing items (such as a computer, a magazine, a CD, or even a gun) or, more pertinent to

14

our case, allow someone else to examine the contents.'" *Id.* at 1306 (quoting *Matlock*, 415 U.S. at 171 n. 7).[4]

A protected expectation of privacy may exist when "'defendant has taken some special steps to protect his personal effects from the scrutiny of others, but does not unquestionably exist where the co-occupant has ready access (perhaps not theretofore exercised) to the place searched.'" *Id.* (quoting 4 Wayne R. LaFave, *Search and Seizure* § 8.3(f) (4th ed. 2004)). Here, Mr. Ramirez took no special steps to protect his backpack from Ms. Brown's scrutiny. He left it on the floor of a guest bedroom in an apartment they shared. She had ready access to the room and backpack. Also, privacy "considerations have special weight in the context of two persons living together in an intimate relationship" because "[s]uch a relationship bespeaks a significant sacrifice of individual privacy." *Id.* "'[T]he question is not whether the object seized was a personal effect of the nonconsenting spouse, but rather whether the object was kept in a place devoted to his exclusive use.'" *Id.* (quoting LaFave, *supra,* § 8.3(f)).

Ms. Brown and Mr. Ramirez dated one another and lived together. Officers knew of Ms. Brown's status in the apartment and Mr. Ramirez's life. The backpack was lying on the floor of a guest bedroom when Ms. Brown picked it up and searched through it. In this context, a police officer reasonably could believe that Ms. Brown possessed authority to search through a bag lying on the floor of a room commonly accessed by both residents of the apartment. Given the nature of Ms. Brown's relationship to defendant, a reasonable police officer also could believe that Mr. Ramirez assumed the risk that Ms. Brown may look through his bag. Mr. Ramirez did

---

[4] *But see United States v. Turner*, 23 F. Supp. 3d 290, 310 (S.D.N.Y. 2014) (concluding that though defendant's girlfriend had apparent authority to consent to a police search of defendant's apartment, that consent did not extend to the search of a closed backpack known by the police to be owned and controlled by defendant that was located in defendant's closet, where police had no indication that defendant's girlfriend possessed any ownership, control, or right to use the backpack).

not hide his backpack, take steps to prevent others from accessing it, or keep it in a place devoted to his exclusive use. An officer in Officer Picht's position reasonably could believe that Ms. Brown had authority to search the guest bedroom—including a bag on the floor of that room—in the apartment she shared with defendant. Thus, the court finds Ms. Brown had apparent authority to search the bag. The search thus didn't violate the Fourth Amendment.

### C. Inevitable discovery

Finally, the government argues that even if the search of the backpack violated Mr. Ramirez's Fourth Amendment rights, the court should not suppress evidence derived from the search based on the inevitable discovery doctrine. The court agrees, and thus denies defendant's motion for yet another reason.

Under this doctrine, evidence acquired in violation of the Fourth Amendment "need not be suppressed if agents inevitably would have discovered it through lawful means independent from the unconstitutional search." *United States v. Loera*, 923 F.3d 907, 928 (10th Cir. 2019) (citing *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014)).

> The government is required to prove by a preponderance of the evidence that the unlawfully-obtained evidence would have been discovered through lawful means. The "lawful means" need not be a second, independent investigation. Rather, the inevitable discovery doctrine will apply if there was "one line of investigation that would have led inevitably to the obtaining of a search warrant by independent lawful means but was halted prematurely by a search subsequently contended to be illegal."

*Id.* (quoting *Christy*, 739 F.3d at 540) (emphasis omitted). To determine whether a hypothetical line of investigation inevitably would have led to securing a search warrant by independent lawful means, the court must "place the government officers in the 'same positions they would have been in had the impermissible conduct not taken place,'" and "'ask whether the government

would have inevitably discovered the evidence lawfully.'" *Id.* (quoting *Nix v. Williams*, 467 U.S. 431, 447 (1984)).

The government asserts that after Ms. Brown showed Officer Picht the hydrocodone bottle with the label scratched off and told him she found it inside Mr. Ramirez's backpack—had Officer Picht stopped her private search in that moment—law enforcement officers could and would have sought a search warrant for the backpack and thus would have inevitably discovered its contents. Officer Perdue testified that the hydrocodone bottle with the name scratched off the prescription constitutes evidence of a crime. He also testified that based on family member's statements about Mr. Ramirez's substance abuse and discovery of that bottle with the knowledge that it came from defendant's backpack, he had enough evidence to apply for a warrant for the backpack. The prevailing case law confirms the officer's judgment.[5]

---

[5] To determine whether probable cause exists to justify a search warrant, a magistrate judge must "'make a practical, common-sense decision whether, given all the facts in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying [ . . . ] information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The standard for probable cause requires that the magistrate had a "substantial basis" to conclude "that a search would uncover evidence of wrongdoing." *Id.* (internal quotation marks and citations omitted). "In determining whether probable cause for a crime existed, [the court doesn't] view the evidence 'in isolation' but 'as ... factor[s] in the totality of the circumstances.'" *United States v. Mongold*, 528 F. App'x 944, 950 (10th Cir. 2013) (quoting *Maryland v. Pringle*, 540 U.S. 366, 372 n. 2 (2003)).

Here, the court finds, the record demonstrates a "fair probability" that contraband or evidence of a crime existed in Mr. Ramirez's backpack, sufficient to support a search warrant after Ms. Brown removed contraband from Mr. Ramirez's backpack, showed it to officers, and told them she found it in his backpack. *See Mongold*, 528 F. App'x at 950 (determining that officers had probable cause that defendant was committing the crime of possessing marijuana even when agent didn't have tips from a reliable source but received complaints from anonymous neighbors about traffic at defendant's home, knew about defendant's drug history, and "heard scurrying and smelled marijuana" at the home); *See United States v. Aquino*, 836 F.2d 1268, 1273 (10th Cir. 1988) (determining that officers "clearly had probable cause" to search defendant's home for additional drugs after informant acquired a sample of drugs from defendant's apartment); *United States v. Becknell*, 601 F. App'x 709, 715 (10th Cir. 2015) (finding magistrate judge had "substantial basis" that probable cause existed when officers discovered cocaine residue and plastic baggies in trash search following informant's tip that individual was selling cocaine); *United States v. Colonna*, 360 F.3d 1169, 1173, 1175 (10th Cir. 2004), *overruled on other grounds by United States v. Little*, 829 F.3d 1177 (10th Cir. 2016) (evidence in trash indicating "only

The court finds that if the officers were in the position that they would've occupied had Ms. Brown stopped searching the backpack after she told Officer Picht that she found the bottle in *defendant's* backpack—the allegedly impermissible conduct—then they would have possessed the probable cause necessary to secure a search warrant for that backpack. The court also finds, based on Officer Perdue's testimony, that officers, in fact, would have secured a search warrant for the backpack and inevitably discovered its contents. Ms. Brown's decision to keep searching through the backpack after handing Officer Picht the hydrocodone bottle, displaced any search warrant process. Thus, even if the search of Mr. Ramirez's backpack violated the Fourth Amendment, the court finds that law enforcement officers had developed sufficient probable cause to secure a search warrant for the backpack's contents. The court finds it is more likely than not that law enforcement officers inevitably would have discovered the backpack's contents through lawful means (if Ms. Brown hadn't searched the backpack before they could do so).

No matter the path taken to get there, the court reaches the same conclusion—the court shouldn't exclude evidence found in Mr. Ramirez's backpack. To safeguard individual rights, courts "crafted the exclusionary rule, under which evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *Estate of Taylor v. Salt Lake City*, 16 F.4th 744, 753 (10th Cir. 2021) (emphasis omitted) (internal citation and quotation marks omitted). The rule's "'prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.'" *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). But the exclusionary rule—often by excluding reliable, trustworthy

---

personal use" of marijuana established a fair probability that contraband would be found in defendant's residence sufficient for search warrant).

evidence—imposes costs on the judicial system and society at large, and thus courts must apply it only "'where its remedial objectives are thought most efficaciously served.'" *See id.* (quoting *Calandra*, 414 U.S. at 348). The court finds that excluding the evidence in this case wouldn't deter future unlawful police conduct because the record contains no evidence even resembling police misconduct. Imposing an expectation on officers to stop Ms. Brown from continuing to search through Mr. Ramirez's backpack within seconds of finding out the bag belonged to defendant wouldn't serve any remedial objective of the exclusionary rule.

### III. Conclusion

For reasons explained above, the court denies Mr. Ramirez's Motion to Suppress (Doc. 26). The warrantless search of his apartment and the backpack inside it satisfied the Constitution.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Alec Ramirez's Motion to Suppress (Doc. 26) is denied.

**IT IS SO ORDERED.**

**Dated this 27th day of October, 2022, at Kansas City, Kansas.**

s/ Daniel D. Crabtree
**Daniel D. Crabtree**
**United States District Judge**
